IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JEFFREY C. BERMANT,<br><br>                    Plaintiff,<br><br>     vs.<br><br>DAVID K. BROADBENT, ESQ., as<br>RECEIVER for MERRILL SCOTT &<br>ASSOCIATES, LTD., MERRILL SCOTT &<br>ASSOCIATES, INC., PHOENIX<br>OVERSEAS ADVISERS, LTD.,<br>GIBRALTER PERMANENTE<br>ASSURANCE, LTD., and each of their<br>respective SUBSIDIARIES and<br>AFFILIATED ENTITIES,<br><br>                    Defendant. | ORDER AND<br>MEMORANDUM DECISION<br><br><br>Civil No. 2:05 CV 466 |

Plaintiff Jeffrey C. Bermant filed this suit after the implosion of Merrill Scott &

Associates, Ltd. ("Merrill Scott").[1]  Merrill Scott provided self-described "advisors to the

affluent," to aid its clients with wealth management and asset protection goals.  Numerous clients

were attracted by Merrill Scott's promises of decreased tax liability and its services designed to

shelter assets.  It now appears that the promises and assurances offered by Merrill Scott were

hollow, and that its various asset growth and protection schemes were too good to be true.

---

[1]Merrill Scott is actually comprised of multiple nominally distinct entities.  For the sake of convenience, this Order and Memorandum Decision refers collectively to Merrill Scott and Merrill Scott-related entities as "Merrill Scott."

After operating for several years, Merrill Scott's house of cards began to collapse.  The final card fell when the Securities and Exchange Commission filed a civil lawsuit against Merrill Scott and its principals, alleging that Merrill Scott misappropriated investor funds and was actively operating a Ponzi scheme by using money obtained from new clients to pay obligations owing to other clients.  A short time after the SEC filed its complaint, the court entered an order freezing the assets of Merrill Scott and appointing David K. Broadbent to serve as the company's receiver.  Currently, the Receiver is actively engaged in gathering Merrill Scott's assets and reviewing claims against the company submitted by Merrill Scott victims.  Additionally, the SEC has submitted a proposed plan of partial distribution that generally contemplates dividing, on a pro rata basis, the recovered assets of Merrill Scott among the clients defrauded by the company.

The prospect of recovering less than the full amount of money they provided to Merrill Scott has caused some former Merrill Scott clients to file objections to the SEC's proposed plan of partial distribution and presumably caused Mr. Bermant to initiate this ancillary proceeding against the Receiver.[2]  Although Mr. Bermant's complaint lists nine different claims for relief, at its core, his argument is not materially different from that raised by other Merrill Scott clients.  The reoccurring theme, sounded by Mr. Bermant and other Merrill Scott clients, is that the Receiver is attempting to claim assets on behalf of the receivership estate that are actually wholly owned by, or should be wholly credited to, specific Merrill Scott clients.

In this proceeding, Mr. Bermant and the Receiver have each filed motions for summary

---

[2]Mr. Bermant filed this lawsuit after requesting that the court lift a stay on litigation against the Receiver. (See Complaint ¶ 3 (dkt. #1) ("This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) and the Order granting Bermant's motion to lift the stay of litigation to permit him to pursue this action was entered in Case No. 2:02-CV-039C, dated March 9, 2005, Docket No. 456.").)

judgment.  Mr. Bermant moves for summary judgment on three of his nine claims for relief: (1) contract recision, (2) set-off, and (3) recoupment.  In essence, Mr. Bermant argues that he has a contractual right to cancel all his dealings with Merrill Scott and that the Receiver has unjustly denied Mr. Bermant's invocation of that right.  Alternatively, Mr. Bermant asserts that he should be allowed to use either the doctrine of set-off or recoupment to avoid the operation of a promissory note that obligates him to pay Merrill Scott $1,500,000.  The Receiver argues in response that if Mr. Bermant receives any of the relief he requests, that relief would amount to unjustified preferential treatment of Mr. Bermant to the detriment of other clients defrauded by Merrill Scott.

The Receiver, consistent with his position that Mr. Bermant's motion for partial summary judgment lacks merit, has filed a motion for summary judgment on a counterclaim that the Receiver filed against Mr. Bermant.  The counterclaim seeks recovery of the money owed under the promissory note.  The Receiver argues that Mr. Bermant can assert no meritorious defenses that would allow him to avoid satisfying his obligations under that note.  Mr. Bermant responds by essentially reasserting the arguments he raises in support of his own motion for partial summary judgment.

The court concludes that Mr. Bermant never obtained a valid contractual cancellation right.  In the absence of such a contractual right, the resolution of this dispute advocated by the Receiver, which equates equality among all Merrill Scott creditors with equity, best furthers the purposes of this federal equity receivership proceeding.  Although the specific details of Mr. Bermant's dealings with Merrill Scott may vary somewhat from those of other Merrill Scott clients, the end result is the same: Merrill Scott misrepresented the manner in which it would

3

handle the funds it received, it misrepresented the amount of control the client would retain over transferred assets, and the client suffered as a result. Given this fundamental similarity between Mr. Bermant and other Merrill Scott clients, it would defeat the purposes of the receivership to allow Mr. Bermant to gain the relief he seeks. Accordingly, the Receiver's motion for summary judgment is granted and Mr. Bermant's motion for partial summary judgment is denied.

## Background

Mr. Bermant first learned about Merrill Scott through an advertisement in the *Robb Report*. The advertisement indicated that Merrill Scott offered its clients comprehensive financial planning services, including asset protection, estate and tax planning, and wealth management. After reviewing the advertisement, Mr. Bermant contacted Merrill Scott and requested additional information about its various services.

Over the following several months, Mr. Bermant and Merrill Scott held multiple discussions that culminated in Merrill Scott's preparation of a Master Financial Plan, which was tailor-made for Mr. Bermant. The details of the plan were presented to Mr. Bermant and his advisers approximately five months after Mr. Bermant first contacted Merrill Scott. Mr. Bermant paid Merrill Scott $113,000 in initial planning and loan fees for the services the company provided.

Through the course of discussions and the preparation of the Master Financial Plan, Merrill Scott proposed multiple financial strategies that it claimed would be beneficial to Mr. Bermant and ultimately persuaded him to purchase Loss of Income Insurance Policies ("LOIs"). Merrill Scott represented that Mr. Bermant, by purchasing the LOIs, would be able to simultaneously protect himself against the possible loss of income and also defer income tax

4

liability.

Merrill Scott's sales pitch was not innovative in any meaningful way.  The purchase of LOIs was simply presented as a mechanism through which Mr. Bermant could invest pre-tax income effectively enough to increase wealth at a rate high enough to eclipse and surpass any tax liability that would ultimately be due on the income.  But the method proposed by Merrill Scott to accomplish this goal was unorthodox.

Merrill Scott proposed that Mr. Bermant invest $2,000,000 of pre-tax income in LOIs that would be purchased from Gibralter Permanente Assurance, Ltd., an entity affiliated with Merrill Scott.  Merrill Scott guaranteed Mr. Bermant an interest rate of no less than 5% annually on the gross amount of the premium paid in connection with those LOIs.  Under the plan, Mr. Bermant would receive distribution payments after ten and twenty years respectively and Merrill Scott asserted that the total investment would reach a minimum of $4,410,453 at the conclusion of the twenty year time frame.  Merrill Scott represented to Mr. Bermant that the LOIs were legitimate financial vehicles that would result in a completely tax-deductible expense and that Mr. Bermant would save in excess of $1,000,000 in taxes over a ten year period.

As the transaction edged toward consummation, Mr. Bermant began to get cold feet.  He expressed concern about committing so much cash to the LOIs and also sought assurances that he could cancel the deal should he change his mind in the future.  Merrill Scott attempted to allay both of Mr. Bermant's concerns.

First, Merrill Scott proposed that Mr. Bermant ease the burden of the cash outlay by taking a loan from a Merrill Scott entity.  The policy language of the LOIs did not indicate that loans could be taken out against the LOIs and, in fact, other literature that Mr. Bermant received

from Merrill Scott implied that loans could not be taken out against the LOIs.  Nevertheless, Mr.

Bermant's understanding was that Merrill Scott, through the loan agreement, would essentially

be returning a portion of the money paid to purchase the LOIs.  Merrill Scott told Mr. Bermant

that if he participated in the LOI program, Merrill Scott would reduce the interest rate applicable

to the loan and that Mr. Bermant would incur only relatively nominal tax-deductible interest

expenses until Merrill Scott returned the LOI premiums, at which time Mr. Bermant could repay

the loan in full.

Second, Merrill Scott assured Mr. Bermant that he could revoke the purchase of the LOIs

at anytime and that, should Mr. Bermant choose to cancel the parties' arrangement, Merrill Scott

would only charge a penalty equal to 5% of the gross premium paid for the LOIs.  The amount

refunded to Mr. Bermant would be less any outstanding balance on the loan made to Mr.

Bermant.  The cancellation assurance came in the form of a letter from James Landis, who was

one of Mr. Bermant's primary contacts at Merrill Scott.  The letter stated that "[t]his cancellation

right is a special provision that modifies the terms of the policy as issued."  (Letter from James P.

Landis to Alfred F. DeLeo, Jan. 15, 2001, attached as Ex. 16 to Decl. of Jeffrey C. Bermant in

Supp. of Mot. for Summ. J., attached as Ex. A to Memo. of Law in Supp. of Plf.'s Mot. for

Partial Summ. J. (dkt. #69).)  Mr. Bermant withheld the release of the funds designated to

purchase the LOIs until he received this assurance from Mr. Landis.

His two primary concerns assuaged, Mr. Bermant decided to go through with the

transaction.  But he did not purchase the LOIs himself.  Rather, he chose to use two limited

liability companies to purchase the LOIs.  The two entities were: BDC-Storke Development,

LLC, and BDC-Storke Investors, LLC (collectively the "Storke entities").  The Storke entities

were created at some point before Mr. Bermant's association with Merrill Scott.  BDC-Storke Development purchased a $350,000 policy and BDC-Storke Investors purchased a $1,650,000 policy.  Each company named Mr. Bermant as the insured under the respective policies.

Mr. Bermant claims that he used his own money--that he either directly contributed or that he was entitled to receive as part of a distribution--to enable the Storke entities to purchase the LOIs and that the LOIs, though nominally owned by the Storke entities, were always treated as Mr. Bermant's personal assets.  (See Memo. in Response to Receiver's Mot. for Summ. J. 10 (dkt. #78) ("The LOI Policies were at all times considered to be assets of Bermant.  The Policies were purchased by the Storke Entities rather than Bermant personally merely as a matter of convenience and tax return presentation.").)[3]

After releasing the funds designated to purchase the LOIs, Mr. Bermant signed a promissory note, pledging as collateral an assignment of income distributions due from JCB, Ltd., in which Mr. Bermant held a partnership interest.  In exchange, Mr. Bermant personally received a $1,500,000 loan from Legacy Capital, an entity affiliated with Merrill Scott.  A portion of the $2,000,000 premium paid to secure the LOIs was apparently transferred to Legacy Capital by Gibraltar Permanente through Fidelity Funding, Ltd., another entity affiliated with

─────────────────

[3]In an earlier filing, Mr. Bermant explained his use of the Storke entities in the following manner:

> In discussions with his advisors, Mr. Bermant determined to purchase the policies through the Storke entities rather than personally.  This was done because large allocations of taxable income and large cash distributions were due Mr. Bermant out of these entities, so rather than make distributions to him and have large taxable income flow through him from the Storke Entities, while having a separate large deduction on his personal tax return for the policy premiums, it made more sense from a tax return presentation standpoint to have the Storke Entities purchase the policies and have a reduced amount of taxable income flow through to him out of these entities.

(Memo. of Law in Supp. of Plf.'s Mot. for Partial Summ. J. 6 (dkt. #69).)

Merrill Scott.  Legacy Capital then transferred just under $1,500,00 directly to Mr. Bermant, who now contends that Merrill Scott essentially loaned him three-quarters of the money that he paid (through the Storke entities) for the purchase of the LOIs.

Within a year after the Storke entities purchased the LOIs, Mr. Bermant wanted to cancel the transaction.  But when he contacted Merrill Scott, the company indicated that cancellation of the deal was not in Mr. Bermant's or Merrill Scott's best interest because of potential IRS scrutiny.  Mr. Bermant made no further attempt to invoke the cancellation clause until after the SEC filed suit against Merrill Scott and the company went into receivership.

After the SEC filed suit against Merrill Scott, the IRS notified Mr. Bermant that it would disallow the deductions that Mr. Bermant claimed in relation to the LOIs.  The IRS has also taken the position that Mr. Bermant owes in excess of $1,200,00 in back taxes, penalties, and interest.  Mr. Bermant has requested that the Receiver honor the cancellation right evidenced by the letter from Mr. Landis.  Not only has the Receiver refused to cancel Mr. Bermant's dealings with Merrill Scott, but the Receiver is also attempting to collect on the $1,5000,000 promissory note that Mr. Bermant executed in favor of Legacy Capital.

Mr. Bermant submitted a claim against the receivership estate totaling $2,113,000.  It is Mr. Bermant's position that, even if he is unable to invoke the cancellation provision and repudiate his dealings with Merrill Scott, the receivership estate still owes him in excess of $2,000,000.  Mr. Bermant essentially requests complete cancellation of the $1,500,000 promissory note and a recovery from the receivership estate in the amount of approximately $613,000.

## Summary Judgment Standard

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c);  see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."  Liberty Lobby, 477 U.S. at 252; see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact.").

## Analysis

The judicial system has frequently been called upon to remedy the damage caused by financial fraud.  But no case provides a better starting point for analyzing the issues now presented to the court than that of Charles Ponzi.  In the early twentieth century, Mr. Ponzi, starting with $150 in initial capital, put into motion an elaborate financing scheme engineered to benefit himself at the expense of others.  Mr. Ponzi convinced individuals to loan him money to further what was later revealed to be a fictitious business enterprise.  Eight months after starting his scheme, Mr. Ponzi had received nearly $10,000,000 from would-be lenders.  He convinced

9

people to participate by paying off initial lenders with the money he received from later lenders. In this way, Mr. Ponzi managed to present a facade of confidence and solvency that ultimately lured more individuals into his net.

Several years after Mr. Ponzi's scheme collapsed, trustees of Mr. Ponzi's bankruptcy estate were still mired in litigation, attempting to disallow as preferences certain payments made by Mr. Ponzi to lenders within the four-month period preceding the filing of Mr. Ponzi's bankruptcy petition. The dispute landed before the United States Supreme Court, which was confronted with the question of whether lenders who demanded and received payment from Mr. Ponzi by relying on the terms of the loan agreement itself should be treated differently from those who sought to rescind the loan agreements on the equitable ground of fraud. See Cunnigham v. Brown, 265 U.S. 1, 10-11 (1924). The Court concluded that "the victims of Ponzi were not to be divided into two classes, those who rescinded for fraud and those who were relying on his contract to pay them." Id. at 13. Rather, the Court looked at the reality of the situation, concluding that Mr. Ponzi's victims "were all of one class, actuated by the same purpose to save themselves from the effect of Ponzi's insolvency. . . . It is a case the circumstances of which call strongly for the principle that equality is equity." Id.

The Supreme Court's statement that equality is equity has become the theme of the Receiver in this case. Like those lenders of Mr. Ponzi who rescinded on the basis of contractual terms, the Receiver argues that Mr. Bermant should not be treated differently than other victims of Merrill Scott simply because Mr. Bermant asserts that he has a contractual right to cancel his dealings with Merrill Scott as well as equitable grounds for recision. To the same effect, the Receiver contends that Mr. Bermant's claims for set-off and recoupment are ineffective because

10

granting Mr. Bermant such equitable relief would unadvisedly undercut the broader equitable

purposes the receivership is designed to serve.  Regardless, even if the Mr. Bermant is allowed to

pursue his claims, the Receiver argues that Mr. Bermant's claims fail on their merits.

Mr. Bermant responds that the Receiver simply stands in the shoes of Merrill Scott and is

subject to all claims and defenses that could be raised against Merrill Scott itself.  The parties'

diametrically opposed understanding of the relevant case law evidences the reality that the extent

to which a federal equity receiver can avoid claims--whether characterized as legal or equitable--

that threaten to diminish the assets of the receivership estate is not yet irrefutably established.

But there is no need to establish the limits of a federal equity receiver's ability to avoid such

claims in this case because the court concludes that Mr. Bermant's claims against the Receiver

fail on their merits.  Mr. Bermant never received a legally enforceable cancellation right from

Merrill Scott and the manner in which Mr. Bermant structured his dealings with Merrill Scott

precludes his ability to rely on the doctrines of set-off and recoupment to recover from the

receivership estate.  Accordingly,  Mr. Bermant's motion for summary judgment is denied and

the Receiver's motion for summary judgment is granted.

## I.      Viability of Claims Raised Against a Federal Equity Receiver

Mr. Bermant asserts that he has a valid contractual right to unwind his dealings with

Merrill Scott at any time and that, even if the contractual right is not honored, he is nevertheless

entitled to the relief afforded by the doctrines of set-off and recoupment.  The underlying premise

of the arguments advanced by Mr. Bermant is that the Receiver is subject to all claims and

defenses that Mr. Bermant could have asserted or raised against Merrill Scott itself.

Courts routinely hold that federal equity receivers, appointed in conjunction with SEC

enforcement actions, are not necessarily subject to all claims that could have been raised against an entity before the establishment of a receivership.  See, e.g., SEC v. Elliott, 953 F.2d 1560, 1569 (11th Cir. 1992) (purposes underlying federal equity receivership could be improperly thwarted by allowing certain victims to pursue equitable relief) ; United States v. Durham, 86 F.3d 70, 73 (5th Cir. 1996) (finding no error when a court exercising its discretionary authority to manage a federal equity receivership refused to allow tracing of funds); United States v. Vanguard Inv. Co., 6 F.3d 222, 226-27 (4th Cir. 1993) ("Given its equitable nature and purposes, a district court supervising such a receivership has the discretionary power to deny these equitable remedies as inimical to receivership purposes even though they might be warranted under controlling law."); cf. Cunningham, 265 U.S. at 13 ("[E]quality is equity[.]").

When determining whether a claim against a federal equity receiver may proceed, courts typically draw a distinction between equitable claims and claims at-law.  In his motion for partial summary judgment, Mr. Bermant raises both types of claims.  A review of relevant case law indicates that the extent to which a party can pursue a claim, whether categorized as equitable or at-law,  against a federal equity receiver is not sharply defined.  The allowance or disallowance of such claims will depend in large part on the context in which the claims arise.  While the court expresses serious doubts about the viability of Mr. Bermant's claims, both equitable and at-law, there is no need to definitively determine whether the Receiver may avoid any of Mr. Bermant's claims because those claims fail on their merits.

## II.  The Merits of Mr. Bermant's Claims

Mr. Bermant alleges that he is entitled to relief on three separate grounds.  But to succeed on each of his claims, Mr. Bermant must prevail upon the court to ignore the manner in which he

actually chose to structure his relationship with Merrill Scott and instead enforce the parties'
"understanding" of what their association truly entailed.  Mr. Bermant has failed to provide any
persuasive authority that would support disregarding the chosen structure of the various
agreements involving Merrill Scott.  Accordingly, and as discussed below, each of Mr.
Bermant's claims lacks merit.

A.      *Contract Cancellation*

Mr. Bermant places great emphasis on the fact that he received a written assurance from
Merrill Scott that he could cancel his entire financial relationship with Merrill Scott at any time,
subject only to the payment of a cancellation fee.  But, as with Mr. Bermant's other claims, his
reliance on the letter purporting to grant a right of cancellation is premised on his belief that the
court should enforce Mr. Bermant's understanding of his arrangement with Merrill Scott rather
than the agreements the parties actually entered into.

The letter upon which Mr. Bermant relies does purport to grant Mr. Bermant a
cancellation right.  In the letter, Mr. Landis states: "I have today confirmed with the Board of
Directors of Gibralter Permanente Assurance, Ltd. that Mr. Bermant may cancel his Loss of
Income insurance policy at any time. . . .  This cancellation right is a special provision that
modifies the terms of the policy as issued."  (Letter from James P. Landis to Alfred F. DeLeo,
Jan. 15, 2001, attached as Ex. 16 to Decl. of Jeffrey C. Bermant in Supp. of Mot. for Summ. J.,
attached as Ex. A to Memo. of Law in Supp. of Plf.'s Mot. for Partial Summ. J. (dkt. #69).)  But
the letter does not mesh with the legal reality of the parties' dealings.

To begin with, the letter is inconsistent with the provisions of the LOIs that designate the
proper method for modifying policy terms.  That policy language requires that any change to the

policy terms "be in writing and signed by our President or Secretary, or one of our Vice Presidents or Assistant Secretaries."  (Loss of Income Insurance Policy 1, attached as Ex. 19 to Decl. of Jeffrey C. Bermant in Supp. of Mot. for Summ. J., attached as Ex. A to Memo. of Law in Supp. of Plf.'s Mot. for Partial Summ. J. (dkt. #69).)  Mr. Landis's title, as indicated on the letter itself, is director of financial planning.  (Letter from James P. Landis to Alfred F. DeLeo, Jan. 15, 2001, attached as Ex. 16 to Decl. of Jeffrey C. Bermant in Supp. of Mot. for Summ. J., attached as Ex. A to Memo. of Law in Supp. of Plf.'s Mot. for Partial Summ. J. (dkt. #69).)

Even if the letter could effectively modify the terms of the policies, the cancellation provision is completely at odds with the express terms of the LOIs.  The letter proposes a cancellation fee that takes into account amounts owing on outstanding loans, but the LOIs themselves do not contemplate the possibility of the existence of loans related to the policy premiums.  (See id.; Loss of Income Insurance Policy, attached as Ex. 19 to Decl. of Jeffrey C. Bermant in Supp. of Mot. for Summ. J., attached as Ex. A to Memo. of Law in Supp. of Plf.'s Mot. for Partial Summ. J. (dkt. #69).)

Further, the letter purports to grant Mr. Bermant, personally, the right to cancel policies that, as discussed above, are owned by the Storke entities.  Mr. Bermant has provided no authority in support of the proposition that a party to a contract can unilaterally grant an individual the ability to terminate a contract to which that individual is not a party.  And the record is absent of any evidence indicating that the Storke entities consented to the contractual modification purportedly effected by Mr. Landis's letter.

Moreover, the letter from Mr. Landis completely ignores the manner in which Mr. Bermant and Merrill Scott chose to structure their association.  Far from an enforceable

14

contractual right, the letter from Mr. Landis is simply further evidence that Merrill Scott and its clients frequently attempted to retain the benefits that flowed from structuring transactions in a certain way while never intending to honor the commitments or recognize the limitations attendant to utilizing such a structure.  Mr. Landis's letter may be an alteration to the "understanding" between Merrill Scott and Mr. Bermant, but the parties' understanding of a relationship does not necessarily control over the manner in which the parties finally structure their association.  This is especially the case here, where the record indicates that the parties' understanding of their association was purposefully inconsistent with the mechanisms used to effect that association.  In short, the letter from Mr. Landis does not grant Mr. Bermant an enforceable contractual cancellation right and Mr. Bermant's reliance on that letter is misplaced.

B.      *Set-Off*

        "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 18 (1995) (quoting Studley v. Boylston Nat'l Bank, 229 U.S. 523, 528 (1913)).  Here, set-off is inapplicable because the debts are not mutual.

        Mr. Bermant chose to purchase the LOIs through the Storke entities.  The Storke entities were designated as the owners of the LOIs and the money used to purchase the LOIs came from the Storke entities.  Although the Storke entities purchased the LOIs, Mr. Bermant personally accepted the loan from Legacy Capital.  The doctrine of set-off is designed to avoid "the absurdity of making A pay B when B owes A." Studley, 229 U.S. at 528.  The absurdity sought to be avoided through the use of set-off is not present when debts are mutually exclusive, as the

debts now at issue appear to be.

Nevertheless, Mr. Bermant asserts that when the legal formalities that characterized his dealings with Merrill Scott are disregarded, it is apparent that mutual obligations exist between Mr. Bermant and Merrill Scott.  Mr. Bermant cannot have it both ways.  Cf. Betson v. Comm'r of IRS, 802 F.2d 365, 368 (9th Cir. 1986) ("[I]f a taxpayer chooses to conduct business through a corporation, he will not subsequently be permitted to deny the existence of a corporation if it suits him for tax purposes.").  During his dealings with Merrill Scott, Mr. Bermant was well aware that separate entities were being used to facilitate the various transactions.  During Mr. Bermant's deposition, the following exchange took place:

> Q.    Now, you understood at the time that this transaction occurred that you were taking a loan from Legacy Capital and investing in a loss of income policy, correct?
>
> A.    All one deal, yes, correct.
>
> Q.    And as part of that deal, was it your understanding that you had to have-- that the entity you were borrowing from and the entity you were purchasing the LOI policy through had to be separate entities?
>
> A.    That is an interesting question, Mr. Wing.  What I understood was it had to look like they were separated enough for the IRS.

(Deposition of Jeffery C. Bermant, Aug. 17, 2006, 44:10-22, attached as Ex. E to Memo. in Supp. of Mot. for Summ. J. (dkt. #67-1) (emphasis added).)  Mr. Bermant is asking the court to characterize the form of and parties to his various transactions with Merrill Scott as mere formalities although he fully recognized that those same formalities were necessary to maximize

the financial benefit he would gain by making use of Merrill Scott's services.[4]

Further, although Mr. Bermant insists that the Storke entities were controlled by him and that any activity by the Storke entities was essentially action taken by Mr. Bermant individually, the record establishes that both Storke entities had members in addition to Mr. Bermant. Additionally, the Storke entities were California limited liability companies and the California Corporations Code states that "[a] member or assignee [of a limited liability company] has no interest in specific limited liability company property."  Cal. Corps. Code § 17300.

It may be that Mr. Bermant and the other members of the Storke entities considered the LOIs to be Mr. Bermant's personal property, but as a matter of law, they simply were not. Accordingly, the respective debts of Merrill Scott and Mr. Bermant are not mutual, and Mr. Bermant is not entitled to set-off.

C.    *Recoupment*

Mr. Bermant takes the position that even if mutuality is lacking, he can still be fully credited for the LOI premiums under the doctrine of recoupment.  As noted by Mr. Bermant, the

---

[4]In his memorandum opposing the Receiver's motion for summary judgment, Mr. Bermant cites to multiple cases in which courts have found mutuality by looking through nominal parties to reveal the real parties in interest.  See, e.g., In re New Haven Foundry, 285 B.R. 646, 648 (E.D. Mich. 2002) ("[T]he court can look through the transactions and nominal parties to determine the real parties in interest."); In re First Nat'l Bank, 23 F. Supp. 255, 258 (E.D. Ill. 1938) ("While mutuality is ordinarily required, a court of equity looks through the nominal parties to the real parties in interest[.]").  But none of the cases cited by Mr. Bermant have direct applicability to this case.  See In re New Haven Foundry, 285 B.R. at 648 (addressing whether mutuality is satisfied when one party is an assignee of a debt); Harrison v. Adams, 128 P.2d 9, 12 (Cal. 1942) (party who was assigned debt for collection purposes cannot set-off personal debt with assigned debt); L.A. County Employees Ret. Ass'n v. Towers, Perrin, Forster & Crosby, Inc., No. CV 01-1351DDP(CTX) (C.D. Cal. June 20, 2002), 2002 WL 32919576 at *15-*16 (relying on the "unitary creditor" doctrine, which is applicable to government entities, in concluding that a county retirement association and the county itself were a single governmental entity for the purposes of set-off); In re First Nat'l Bank, 23 F. Supp. at 258 (primarily involving shareholder immunity but allowing set-off "to prevent an inequitable result" when a debt was owed by an individual's "puppet corporation," which was under the individual's "sole dominance" and set up for the sole purpose of shielding the individual from liability); Gallagher v. Clark, 7 F. Supp. 158, 159-160 (S.D. Iowa 1934) (echoing the principle that a party that holds a debt in trust cannot offset that debt against a personal debt).

terms "set-off" and "recoupment" are often used interchangeably because the relief afforded by

the respective doctrines is the same.  But there is authority acknowledging a distinction between

the two doctrines.  For example, in <u>Styler v. Jean Bob Inc. (In re Concept Clubs, Inc.)</u>, 154 B.R.

581 (D. Utah 1993), the court distinguished recoupment from set-off in the following manner:

> A 'recoupment' is an offset based upon a claim for relief arising from the <u>same</u>
> <u>transaction</u> as the plaintiff's claim or cause of action, strictly for the purpose of
> abatement or reduction of such claim.  Unlike a setoff, a recoupment lacks the
> concept of mutuality of obligations and arises out of a single transaction between
> creditor and debtor.

<u>Id.</u> at 586 n.3 (internal quotation and citation omitted); <u>see also</u> <u>Ashland Petroleum Co. v. Appel</u>

<u>(In re B&L Oil Co.)</u>, 782 F.2d 155, 157 (10th Cir. 1986) ("[A] creditor properly invoking the

recoupment doctrine can receive preferred treatment even though setoff would not be permitted.

A stated justification for this is that when the creditor's claim arises from the same transaction as

the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than

a mutual obligation, and application of the limitations on setoff in bankruptcy would be

inequitable." (internal quotation and citation omitted)).

The cases cited by Mr. Bermant indicate that it is possible for a claimant to pursue relief

under the doctrine of recoupment when set-off is otherwise unavailable.  But all of the cases

upon which Mr. Bermant relies involve bankruptcy disputes.  While bankruptcy jurisprudence

does often provide useful guidance for resolving receivership issues, the role recoupment plays in

bankruptcy actions is unique in many ways.  <u>See</u> <u>In re B&L Oil Co.</u>, 782 F.2d at 157  ("Modern

rules of pleading have diminished the importance of the common-law distinctions surrounding

recoupment and its companion, setoff.  But in bankruptcy these distinctions remain important."

(internal citation omitted)); <u>see also</u> <u>Conoco, Inc. v. Styler (In re Peterson Dist., Inc.)</u>, 82 F.3d

956, 959 (10th Cir. 1996) ("Setoff, codified in 11 U.S.C. § 533(a), gives a creditor the right to

offset a mutual debt . . . provided that both debts arose before commencement of the bankruptcy

action . . . .  Recoupment, on the other hand, is the setting up of a demand arising from the same

transaction as the plaintiff's claim . . . . (internal quotation and citation omitted)).

While the doctrine of recoupment is recognized in bankruptcy actions, it is narrowly

construed to further the goal of ensuring that all creditors receive an equal share of any

distribution.  See In re Peterson Dist., Inc. 82 F.3d at 959 ("Recoupment is 'narrowly construed'

in bankruptcy cases because it violates the basic bankruptcy principle of equal distribution to

creditors." (citing In re B&L Oil Co., 782 F.2d at 158)).  In fact, the doctrine is so narrowly

construed that even if obligations arise out the same contract, a court will not necessarily

conclude that the obligations arose out of the same transaction.  See id. at 960.  Instead, "the

doctrine is only applicable to claims that are so closely intertwined that allowing the debtor to

escape its obligation would be inequitable notwithstanding the Bankruptcy Code's tenet that all

unsecured creditors share equally in the debtor's estate."  Id. (citing Univ. Med. Ctr. v. Sullivan

(In re Univ. Med. Ctr.), 973 F.2d 1065, 1081 (3d Cir. 1992)).

Mr. Bermant's claim for recoupment must be denied for the same reasons as his claim for

set-off.  Mr. Bermant's claim that the obligations at issue arose from the same transaction once

again requires turning a blind eye to the manner in which the parties chose to structure their

financial relationship.  If courts express hesitancy when applying recoupment even though the

dealings at issue are confined to a single, integrated contract, the doctrine has no role to play here

where the monetary obligations were created through a series of contracts involving multiple

parties.  And, to the extent the application of recoupment is dependent upon a weighing of the

equities, there is nothing in the record to indicate that Mr. Bermant should, in essence, be granted a preference over other Merrill Scott creditors. Accordingly, Mr. Bermant's request for recoupment is denied.[5]

## III.   The Receiver's Counterclaim

In response to Mr. Bermant's complaint, the Receiver filed a counterclaim alleging breach of contract and unjust enrichment. The Receiver now requests summary judgment on those claims. Mr. Bermant does not dispute that he is a party to the promissory note held by the Receiver, that he received the loan from Legacy Capital, or that he has failed to make any payments on that note. Rather, he responds to the Receiver's motion for summary judgment by arguing that he has a contractual right to cancel the promissory note and by asserting his entitlement to the defenses of set-off and recoupment. The court has already concluded that the arguments raised by Mr. Bermant lack merit. Accordingly, the court grants the Receiver's motion for summary judgment.

In his counterclaim, the Receiver alleges that he is entitled to recover attorney fees and also asserts a right to recover income distributions made by JCB, Ltd., which, in the promissory note, were designated as security for the loan. As the record now stands, the court is unable to determine the final amount or source of any judgment to which the Receiver is entitled. Therefore, judgment on those issues is reserved.

---

[5]The conclusion that set-off and recoupment should not be allowed in the context of this case is borne out by the fact that Merrill Scott frequently offered to return, through a loan, a portion of the capital that clients deposited with the company. If set-off and recoupment were available in such a situation, it is possible that those clients who chose to participate in the loan-back programs would, in essence, recover a substantial portion of their Merrill Scott investment, while those victims who selected a different, though equally fraudulent, plan would receive nothing because the receivership estate would already be consumed by victims claiming set-off and recoupment.

**IV.    The Court Deems All of Mr. Bermant's Claims Resolved**

As noted, this suit has so far proceeded separately from the primary enforcement action filed by the SEC.  But Mr. Bermant is also actively participating in the primary action.  For example, Mr. Bermant has filed briefs opposing the SEC's proposed plan of partial distribution, raising the same arguments currently dominating this ancillary suit.  Allowing these two parallel suits to continue is inadvisable for obvious reasons of judicial efficiency.

It is well within the authority of the court to order the use of summary proceedings to resolve disputes concerning a federal equity receivership.  As stated by the Eleventh Circuit:

> The government's and parties' interests in judicial efficiency underlie the use of a single receivership proceeding.  Smith v. American Industrial Research Corp., 665 F.2d 397, 399 (1st Cir. 1981).  A summary proceeding reduces the time necessary to settle disputes, decreases litigation costs, and prevents further dissipation of receivership assets.  SEC v. Wencke, 783 F.2d 829, 837 (9th Cir. 1986), cert. denied, 479 U.S. 818, 107 S.Ct. 77, 93 L.Ed.2d 33 (1986); United States v. Arizona Fuels Corp., 739 F.2d 455, 460 (9th Cir. 1984).

Elliott, 953 F.2d at 1566.  In the present case, Mr. Bermant has been afforded discovery rights and has been allowed to submit evidence in support of his claims.  Those rights have similarly been granted to parties participating in the primary action filed by the SEC.  The use of summary procedures in the primary action will not prejudice Mr. Bermant's ability to contest the appropriateness of the positions taken by the SEC and the Receiver.  See id. ("[A] district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts.").

Mr. Bermant argues that he timely invoked his right to have a trial by jury and that he must be afforded that right unless the court concludes that no right to a trial by jury applies to his case.  See Fed. R. Civ. P. 39(a)(2) ("When a jury has been demanded . . . [t]he trial of all issues

so demanded shall be by jury unless . . . the court . . . finds that a right of trial by jury of some or

all of those issues does not exist under the Constitution or statutes of the United States.").  Mr.

Bermant argues that because his complaint in this matter involves at-law claims, the right to a

jury trial exists and it is improper to force him to abandon this suit in favor of participation in the

primary suit.

Mr. Bermant has not identified any case in which a court overseeing a federal equity

receivership has allowed a victim of the entity in receivership to pursue a separate jury trial in

lieu of participating in the primary suit.  The weight of authority indicates that the court

overseeing the receivership is entitled to use summary proceedings to resolve all issues related to

the receivership.  See, e.g., Elliott, 953 F.2d at 1571; United States v. Fairway Capital Corp., 433

F. Supp. 2d 226, 241 (D. R.I. 2006) ("Federal district courts have wide discretion in granting

relief in an equity receivership and may use summary proceedings in fashioning such relief.");

FDIC v. Bernstein, 786 F. Supp. 170, 177 (S.D.N.Y. 1992) ("In keeping with this broad

discretion, the use of summary proceedings in equity receiverships, as opposed to plenary

proceedings under the Federal Rules of Civil Procedure, is within the jurisdictional authority of a

district court." (internal quotation and brackets omitted)).  Mr. Bermant cannot circumvent the

authority of the court to resolve within the primary case those disputes directly implicating the

receivership estate by suggesting that he is seeking relief at-law as opposed to at-equity.  See

Bernstein, 786 F. Supp. at 178 ("This court is, therefore, empowered to determine in a summary

proceeding the rights and obligations of the parties to the contract, particularly when the issues

presented involve a simple matter of contract interpretation.").

Accordingly, the present action will remain open only to resolve the issue of damages

connected to the Receiver's counterclaim.  If there are any outstanding issues not addressed by this Order and Memorandum Decision, Mr. Bermant has two weeks to bring such issues to the court's attention.  Any filing made in this regard should be filed in the primary SEC enforcement action, <u>SEC v. Merrill Scott & Assocs., Ltd.</u>, 2:02 CV 39 (D. Utah).

<u>**Conclusion**</u>

For the foregoing reasons, The Receiver's Motion for Summary Judgment (dkt. #65) is GRANTED and Plaintiff's Motion for Partial Summary Judgment (dkt. #68) is DENIED.  This case remains open only for the resolution of issues concerning the amount of damages the Receiver is entitled to recover.

SO ORDERED this 12th day of December, 2006.

BY THE COURT:

TENA CAMPBELL
United States District Judge